OPINION
{¶ 1} M. Edward Nieland is appealing from his convictions in two consolidated cases of five counts of gross sexual imposition and two counts of kidnapping. After a four-day trial he was found guilty by a jury of these counts and was duly sentenced to an aggregate term of five years and found to be a sexually-oriented offender.
 {¶ 2} On appeal, Nieland raises six assignments of error:
 {¶ 3} The victim, who we will refer to as T.M., was a 13-year old boy at the time police learned that Nieland was sexually abusing him. T.M., a good student, student council member, and athlete at his high school, met Nieland through their church and the victim's father. Over time, Nieland became a family friend of T.M. and his parents. He generously gave to T.M.'s family, and in turn, the family assisted Nieland with his home. Specifically, members of the family cut Nieland's grass once a week, including T.M. Eventually, starting in the Spring of 2002, T.M. was often left alone with Nieland to cut his grass, and Nieland would pick up T.M. and bring him home.
 {¶ 4} The incidents which initially gave rise to the charges in the indictment began in the Spring of 2002 when T.M. was eleven years old. After coming into Nieland's house after cutting Nieland's grass the first time, Nieland told T.M. to remove his socks and shoes so as not to dirty the floors, and T.M. and Nieland watched television together. Nieland asked T.M. to remove his shirt so he could wipe him down to relieve any itching. T.M. testified that Nieland wiped down his arms and legs. T.M. said he was scared but said nothing to Nieland. (T. 77). T.M. said later that summer, Nieland again invited him into his home after T.M. finished cutting Nieland's grass, and this time Nieland asked him to remove all his clothes but his underwear so Nieland could wipe him down again. T.M. testified that Nieland "tickled" him on his bottom. At the end of the summer, Nieland again invited T.M. into his house and this time asked him to remove all his clothes so he could remove grass chemicals before T.M. sat on Nieland's couch. T.M. testified Nieland wiped his arms, legs, chest, and back including his thighs. (T. 80).
 {¶ 5} T.M. testified he never told anyone about Nieland's conduct and returned to cut Nieland's grass in the Spring of 2003. T.M. testified that again after he cut Nieland's grass, he wiped his arms and legs down after he himself removed his shirt. (T. 82). T.M. testified the next time he cut Nieland's grass, he removed all his clothes to avoid damaging Nieland's couch and Nieland again wiped him down. T.M. testified the next time he cut Nieland's grass, it began raining and he had to stop cutting the grass and enter Nieland's house. T.M. said Nieland told him to remove his wet pants and shirt. T.M. said Nieland told him to sit on his lap to avoid getting his couch wet. T.M. said he sat on Nieland's lap because he was scared. T.M. said he itched his arm and Nieland thought T.M. had grass chemicals on his arm so he told T.M. to remove all his clothes. T.M. said Nieland wiped him down completely except his butt and crotch area. (T. 88). T.M. said Nieland then told him to sit on his lap. T.M. said Nieland pushed him up and sat him on his lap and they played with Nieland's laptop computer. (T. 89). Later T.M. said Nieland began to lecture him about T.M.'s attitude toward his sister and T.M. didn't pay close attention. T.M. said Nieland became agitated and Nieland told T.M. to sit on his lap and face him. T.M. was totally undressed. T.M. said he tried to move away from Nieland but he held him down on his lap. (T. 96). Nieland then grabbed his penis and said "My little T is growing up." (T. 200). T.M. said Nieland held T.M.'s penis for a while and then hugged him and kissed him on the cheek. (T. 204). T.M. said he was scared of Nieland but did not say anything to him about Nieland's inappropriate conduct.
 {¶ 6} The following day, Nieland had an argument with T.M. about his homework in the presence of T.M.'s sister. Afterward, Nieland left and T.M. disclosed the abuse to his sister. She in turn called her parents, who were out of town, and they immediately returned to the Dayton area.
 {¶ 7} T.M. and his family called Beavercreek Police and spoke with Det. Shawn Sumner. At the direction of Det. Sumner, T.M.'s father placed a taped phone call to Nieland. During the course of the phone call, Nieland gave misleading and deceptive answers as to the conduct that occurred in his home on May 10, 2003. Eventually, Nieland began making statements about child molestation in regards to himself, advised that he had to get T.M. out of the home on May 10, 2003 because things were getting out of hand, and that what he did was wrong. A short time later, after T.M.'s father had left the Beavercreek Police Department, Nieland called and spoke to him a second time. During the second call, Nieland told T.M.'s father that he was "sick and needed help," implying that he had a sexual problem.
 {¶ 8} Shortly after his conversation with T.M.'s father, Nieland went to Dorie Ferrell to discuss the impending crisis with T.M.'s family. Distraught, Nieland told Dorie Ferrell, "I may have molested T.M." Nieland further described the events of May 10, 2003, but left out several key details, including the fact that he had touched T.M.'s penis. However, he did indicate that T.M. had been nude in the home. After Ferrell's admonishment, Nieland stated, "A man has needs," directly in response to his conduct with T.M. Uncomfortable with his responses, Ferrell sent Nieland to speak with John Carter, another mutual friend.
 {¶ 9} When Carter spoke with Nieland minutes later, Nieland again appeared disjointed and rambling. He reiterated that he "may have molested T.M.," to Mr. Carter. Det. Sumner obtained a probable cause warrant and went to Nieland's home. When Nieland saw Det. Sumner and Det. Jeff Fiorita, he immediately slumped and became dejected. Sumner interviewed Nieland inside the home, and Nieland told Sumner that he had in fact touched T.M.'s penis, but that he did it after T.M. consented and for the purpose of checking his level of puberty. Sumner asked Nieland if he became aroused during the touching. In direct response to that question, Nieland stated that "You have to understand, I'm 41 years old and still a virgin, I get excited easily." As he was being arrested and removed from the home, Nieland repeatedly stated to Det. Sumner and Det. Fiorita that "How could I do this to a family I love?"
 {¶ 10} In his first assignment, Nieland contends the trial court abused its discretion in refusing to grant him a continuance of his trial.
 {¶ 11} The record reveals that the trial court continued Nieland's trial on six occasions. On July 22, 2004, the trial court granted the State's liminal motion to prevent the defendant's expert witness, Dr. Frederick Peterson, Jr., from opining whether Nieland touched the alleged victim for the purpose of sexual gratification. On September 8, 2004, the trial court again granted a liminal motion by the State to the proposed testimony of Dr. Peterson. Specifically, the trial court ruled that if Nieland refused to submit to an examination by a State's expert and refused to testify at trial, Dr. Peterson would not be permitted to offer Nieland's version of the facts through Dr. Peterson. The court also ruled that if Nieland chose to testify, the State's expert witness would be able to view his testimony and that of the defendant's expert, for purposes of offering rebuttal evidence. The appellant then filed an appeal to this court which was dismissed as interlocutory and from a non-final order.
 {¶ 12} After the matter was again set for trial in December 2004, Nieland filed an appeal of this court's ruling with the Ohio Supreme Court. When the matter came due for trial, and no action had been taken by the Ohio Supreme Court to stay the proceedings, Nieland moved for a continuance which was denied by the trial court.
 {¶ 13} Appellant contends the trial court abused its discretion in denying his continuance motion because he did not know whether he would be required to submit to a psychological examination by the State's expert witness, whether the expert would be sitting in the courtroom viewing his trial testimony, and whether the State's expert witness would then testify.
 {¶ 14} The State contends the trial court did not abuse its discretion in denying defendant's last continuance motion because the trial had been continued on numerous occasions and trial counsel often must proceed with adverse pre-trial motions which are not immediately appealable and proceed with those rulings in mind. We agree. We see no abuse of discretion present in the trial court's ruling. State v. Unger (1981), 67 Ohio St. 2d 65. The first assignment of error is Overruled.
 {¶ 15} In his second assignment, Nieland contends the trial court erred in overruling his motions for acquittal made at the conclusion of the State's case and at the conclusion of the trial. He also argues that his conviction is against the manifest weight of the evidence. He contends that while his conduct with the victim was inappropriate, it was not done with any criminal intent or for sexual gratification.
 {¶ 16} A trial court is compelled to overrule a Crim.R. 29 motion when viewing the evidence in a light most favorable to the State, any rational trier of fact could find the essential elements of the crime proven beyond a reasonable doubt. State v.Jenks (1991), 61 Ohio St. 3d 259. When reviewing a claim that the conviction goes against the manifest weight of the evidence, an appellate court "assumes the role of a thirteenth juror, and reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury has clearly lost its way and created a manifest miscarriage of justice that compels a conviction to be reversed and a new trial ordered." State v. Thompkins (1997), 78 Ohio St. 3d 380, 387. This exceptional power should be used by an appellate court only in the rare case where the evidence weighs heavily against conviction.
 {¶ 17} Nieland contends that nothing unusual took place during the first incident with T.M. He contends there was no evidence of restraint. In the first incident, T.M. testified that Nieland told him to take off his shirt so Nieland could wipe him down because he thought T.M. was itchy. T.M. said Nieland wiped his arms and legs. As to the second incident identified in the bill of particulars, Nieland contends the evidence shows there was no prolonged touching, kissing, or touching of any genital area. He contends that neither he nor T.M. were sexually aroused nor was there any restraint.
 {¶ 18} T.M. did testify that Nieland had him remove his clothes except his underwear and pulled down his underwear a bit and touched him on his bottom. As to incident three at the end of the Summer of 2002, Nieland said he did not touch the child's private parts. T.M., however, testified Nieland had him completely disrobe the third time and Nieland wiped him including his thighs. He said Nieland said he was wiping him down to remove grass chemicals. (T.79) Nieland said he did not touch T.M. inappropriately during the fourth and fifth incidents. T.M. testified that in the Spring of 2003, Nieland again asked him to remove his shoes and socks and shirt after cutting Nieland's grass, and Nieland wiped down his arms and legs. T.M. said Nieland had him remove all his clothes and proceeded to wipe him down again. As to the sixth incident, Nieland contends that although he touched T.M.'s private area, neither he nor T.M. were sexually aroused. He also argued that T.M. was not restrained in any way.
 {¶ 19} Nieland was charged with four counts of gross sexual imposition in violation of R.C. 2907.05 (A)(1) and one count of kidnapping in violation of R.C. 2905.01(A)(4). R.C. 2907.05(A)(1) provides in pertinent parts:
 {¶ 20} "(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
 {¶ 21} "(1) The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force."
 {¶ 22} R.C. 2905.01(A)(4) provides as follows:
 {¶ 23} "(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 {¶ 24} "(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will;"
 {¶ 25} In State v. Eskridge (1988), 38 Ohio St. 3d 56, the Ohio Supreme Court held that the force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength. In Eskridge, the Court noted the age difference and disparity in size between Eskridge and his four-year old daughter who was the victim. Chief Justice Moyer noted the following at page 58 of the Court's opinion:
 {¶ 26} "We also recognize the coercion inherent in parental authority when a father sexually abuses his child. `* * * Force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established. State v. Martin (1946), 77 Ohio App. 553
[33 O.O. 364]; State v. Wolfenberger (1958), 106 Ohio App. 322
[7 O.O. 2d 73]. In the within case, we are confronted with a child being told to do something by an important figure of authority, and commanded not to tell anyone about it. In such a case, we find nothing unreasonable about a finding that the child's will was overcome. Consequently, the forcible element of rape was properly established.' State v. Fowler (1985),27 Ohio App. 3d 149, 154, 27 OBR 182, 187, 500 N.E. 2d 390, 395."
 {¶ 27} In State v. Schaim (1992), 65 Ohio St. 3d 51, paragraph one of the syllabus, the Ohio Supreme Court distinguished Eskridge in holding that:
 {¶ 28} "1. A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit. A threat of force can be inferred from the circumstances surrounding sexual conduct, but a pattern of incest will not substitute for the element of force where the state introduces no evidence that an adult victim believed that the defendant might use physical force against her." In Schaim, the victim was twenty years old and lived at home with the defendant father. Justice Wright noted on page 55 of the Court's opinion:
 {¶ 29} "A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief thatphysical force will be used if the victim does not submit. A threat of force can be inferred from the circumstances surrounding sexual conduct, but a pattern of incest will not substitute for the element of force where the state introduces no evidence that an adult victim believed that the defendant might use physical force against her." Id. at 55. (Emphasis supplied.)
 {¶ 30} In State v. Hiles (Feb. 11, 1994), Mont. App. 13803, we sustained the defendant's conviction of six counts of gross sexual imposition in violation of R.C. 2907.05 (A)(1). The victim of Hiles' conduct was his fifteen year old daughter. His sexual conduct included the caressing of her body, including her buttocks and breasts, while he and his daughter were in bed, or on a couch, or the floor. On another occasion, he rubbed her body with lotion including her buttocks and breasts. The daughter testified she never expressed an objection to or resisted her father's behavior, because he threatened to kill her if she reported the activity. Judge Grady wrote on behalf of this court in Hiles:
 {¶ 31} "At the time of these offenses A.H. was fifteen and sixteen years of age. If the rule of law espoused in Eskridge
applies at all in this case, it would not apply as it might if the child victim was much younger. The necessary element of force required by R.C. 2907.05(A)(1) is not satisfied by the mere fact that the offender is the victim's parent or by some subjective belief or feeling on the part of the victim that submission is required. Some showing by the State that the offender, through his own acts, compelled the victim to submit to sexual contact by `force or threat of force,' however slight, is required." We affirmed the defendant's convictions in Hiles because the victim testified she did not resist him because she feared what he might do to her.
 {¶ 32} R.C. 2907.01(B) provides that sexual contact means any touching of the erogenous zone of another, including without limitation, the thigh, the genitals, buttocks, pubic region, or if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person. This statute contemplates any touching of the described areas which a reasonable person would perceive as sexually stimulating or gratifying. State v.Astley (1987), 36 Ohio App. 3d 247.
 {¶ 33} We agree with the appellant that there is insufficient evidence to support his conviction of gross sexual imposition as set out in Count One of Case No. 2004CR0108. This is the first incident to which T.M. testified. There was no evidence that T.M. was restrained in any way and there was no evidence appellant touched any erogenous zone of T.M. That conviction is also against the manifest weight of the evidence. We agree with appellant there was no evidence that he purposefully compelled T.M. to have sexual contact with him on the second or third incident in 2002 by force or threat of force. Those convictions are also against the manifest weight of the evidence. It is unclear why the State of Ohio did not charge Nieland with a violation of R.C. 2907.05(A)(4) since T.M. was under 13 years of age in 2002 and the State would not have been required to prove the force or threat of force element present in R.C. 2905(A)(1). There was no evidence to support a kidnapping conviction relating to the incidents in 2002.
 {¶ 34} The evidence in this case would support the jury's guilty verdict of gross sexual imposition relating to the last incident on or about May 10, 2003. In that incident Nieland touched T.M.'s penis while holding him down on his lap. In this incident Nieland touched the erogenous zone of T.M. while employing force.
 {¶ 35} This incident would also support a kidnapping conviction. Kidnapping is committed when a person "forcibly" restrains the liberty of another to engage in sexual activity as defined by R.C. 2907.01 with the victim against his will. R.C.2901.01 defines "force" as any violence, compulsion, or constraint physically exerted by any means upon or against any person or thing. Kidnapping and gross sexual imposition, as charged in this indictment, may be "allied" offenses of a similar import under R.C. 2941.25(A). The appellant's second assignment of error is sustained in part.
 {¶ 36} In his third assignment, Nieland contends the trial court's liminal rulings prevented him from presenting an adequate defense. Specifically, Nieland contends Dr. Peterson should have been able to testify and express his opinion that Nieland did not touch T.M. for sexual gratification purposes. Evid.R. 702 provides:
 {¶ 37} "A witness may testify as an expert if all of the following apply:
 {¶ 38} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 39} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training or education regarding the subject matter of the testimony;
 {¶ 40} "(C) The witness' testimony is based on reliable scientific, technical or other specialized information. To the extent that the testimony reports the result of a procedure, test or experiment, the testimony is reliable only if all of the following apply:
 {¶ 41} "(1) The theory upon which the procedure, test or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts or principles;
 {¶ 42} (2) The design of the procedure, test, or experiment reliably implements the theory;
 {¶ 43} "(3) The particular procedure, test or experiment was conducted in a way that will yield an accurate result." (Emphasis added).
 {¶ 44} In State v. Mundy (1994), 99 Ohio App. 3d 275, we held that whether touching was for the purpose of sexual gratification must be inferred from the type, nature and circumstances surrounding the contact. We concluded that the conduct forbidden by sexual imposition is comprehensible to a person of ordinary intelligence. Accordingly, the trial court properly excluded expert witness evidence on that subject. See Evid. R. 702(A). The Supreme Court of West Virginia reached that result in State v. Mutter, 168 W.Va. 531 (1981). The appellant's third assignment of error is Overruled.
 {¶ 45} In his fourth assignment, Nieland contends the trial court erred in refusing to permit him to introduce his exculpatory written statement to police. The trial court, however, properly excluded this evidence as hearsay and no proper exceptions to the use of hearsay were advanced. In any event, much of the exculpatory statements were presented to the jury through the cross-examination of Detective Sumner. There was no abuse of discretion in the trial court's exclusion of the statement. State v. Sage (1987), 31 Ohio St. 3d 173.
 {¶ 46} In his fifth assignment, Nieland contends the trial court improperly classified him as a sexually oriented offender. We agree with the State that appellant's convictions required his classification as a sexually oriented offender.
 {¶ 47} In his last assignment, Nieland says the trial court erred in sentencing him to a prison term. He contends he presented evidence that he was remorseful, that he had a good character and enjoyed a good reputation in the community, and he had no prior criminal record and this evidence should have overcome the statutory presumption that he be sentenced for a first degree felony conviction.
 {¶ 48} In imposing the five year sentence upon Nieland, the trial court noted the following:
 {¶ 49} "What the Court finds most difficult and disturbing is what the Court believes is your lack of remorse for the act you committed. I hear your remorse for the loss of your friendship. I hear the remorse for the circumstances you find yourself in, but I do not hear that you're sorry for the acts you committed. This Court is in total agreement with the verdict of this jury you committed these offenses and you did so for sexual gratification. And, I have taken into consideration in regard to the statements made by the expert witnesses in this case. However, I agree with the statement that your defense in this case is absurd. I believe that your testimony as to what you did in this case, not only when you spoke to the victim's father on the phone the day he called you, but as well as in the courtroom, was a simple wall of gibberish which provided no closeness to any sense of justification or excuse or explanation for what you did in this particular case." (T. 1027-1028)
 {¶ 50} R.C. 2929.13(D) creates a presumption for imprisonment for first-time convictions of first degree felonies. The presumption can be overcome only when the trial court finds that a non-prison sanction 1) punishes the offender and protects the public from future crime, and 2) does not demean the seriousness of the offense. R.C. 2929.13(D). Without both findings, supported by sufficient reasons, the court must impose a prison term. When reviewing a claim that a trial court's sentence is contrary to law, appellate courts can only grant relief when clear and convincing evidence in the record demonstrates that the trial court's findings or sentence is contrary to law. State v.Yancey (May 28, 2004), Montgomery App. No. 20130.
 {¶ 51} The trial court was in the best position to determine whether Nieland was truly remorseful despite Dr. Peterson's belief that he was. The trial court presumably believed that Nieland's lack of remorse meant he might commit similar crimes in the future. The trial court also noted that a non-prison sentence would demean the seriousness of the offenses because they were crimes of violence against a child. We cannot say there is clear and convincing evidence demonstrating that the trial court sentences were contrary to law. The sixth assignment of error is Overruled.
 {¶ 52} The Judgment of the trial court is Reversed in part and Affirmed in part and this matter is Remanded to the trial court for re-sentencing. Specifically, the appellant's convictions for four counts of gross sexual imposition and one count of kidnapping are Reversed and the one count of kidnapping and gross sexual imposition relating to the May 10, 2003 incident are Affirmed. The trial court should in resentencing Nieland determine whether the affirmed gross sexual imposition count is an allied offense of the kidnapping conviction.
Grady, P.J., and Fain, J., concur.