[Cite as *State v. Ruiter*, 2023-Ohio-3594.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

DUSTIN RUITER,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 22 MA 0002**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 19 CR 960

**BEFORE:**
Mark A. Hanni, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Reversed and Remanded in part. Affirmed in part.

---

*Atty. Gina DeGenova*, Mahoning County Prosecutor, and *Atty. Edward A. Czopur*, Assistant Prosecuting Attorney, Mahoning County Prosecutor's Office, 21 West Boardman Street, 6th Floor, Youngstown Ohio 44503, for Plaintiff-Appellee and

*Atty. James R. Wise*, 91 W. Taggart, P.O. Box 85, East Palestine, Ohio 44413, for Defendant-Appellant.

Dated: September 29, 2023

---

**HANNI, J.**

**{¶1}** Defendant-Appellant, Dustin Ruiter (Appellant), appeals from a January 6, 2022 Mahoning County Common Pleas Court judgment sentencing him to a total of 77 years in prison after a jury found him guilty of 73 counts of sex offenses, including rape, attempted rape, sexual battery, and gross sexual imposition (GSI). These offenses were committed against his step-daughter and two biological daughters. For the following reasons, Appellant's first assignment of error has merit. Appellant's second assignment of error lacks merit.

**{¶2}** On November 7, 2019, a Mahoning County Grand Jury issued a secret indictment alleging that Appellant committed the following offenses against his step-daughter K.F., which began when she was 15 years old:

> 21 counts of rape in violation of R.C. 2907.02(B), first-degree felonies (Counts 1-21);
>
> 21 counts of sexual battery in violation of R.C. 2907.03(A)(5),(B), third-degree felonies (Counts 22-42); and
>
> 2 counts of gross sexual imposition in violation of R.C. 2907.05(A)(1), (C)(1), fourth-degree felonies (Counts 43-44).

**{¶3}** The grand jury also indicted Appellant for committing the following offenses against his biological daughter, A.R., which began when she was 14 years old:

> 1 counts of attempted rape violation of R.C. 2923.02/2907.02(A)(2),(B), second-degree felony (Counts 45);
>
> 12 counts of rape in violation of R.C. 2907.03(A)(5),(B), first-degree felonies (Counts 46-58).
>
> 11 counts of sexual battery in violation of R.C. 2907.03(A)(5),(B), third-degree felonies (Counts 59-69);

2 counts of gross sexual imposition in violation of R.C. 2907.05(A)(1), (C)(1), fourth-degree felonies (Counts 70-71).

**{¶4}** The Mahoning County Grand Jury further indicted Appellant for committing the following offenses against his biological daughter, Z.R., which began when she was 13 years old:

2 counts of gross sexual imposition in violation of R.C. 2907.05(A)(1)(C)(1), fourth-degree felonies (Counts 72-73).

**{¶5}** On November 6, 2020, Appellant, through counsel, requested a continuance of the November 16, 2020 trial date because he was attempting to secure the services of an expert witness to review DNA evidence that the State would introduce at trial. The trial court granted the motion and scheduled a pretrial for January 7, 2021.

**{¶6}** The pretrial was held and the court noted that matters were still unresolved in the case. After a number of pretrials and rescheduled trial dates, the transcript shows that on August 12, 2021, Appellant wished to discuss his intent to use an expert at trial. (Aug. 12, 2021 Tr. at 2). Appellant's counsel reported that a friend of Appellant's family agreed to pay to hire an expert and was going to provide payment the following week. (Aug. 12, 2021 Tr. at 3).

**{¶7}** The trial court noted that the case dated back to December 2019 and even though delays occurred due to COVID-19, the trial was previously set for November 2020 and the expert should have been retained before then. (August 12, 2021 Tr. at 4). The court stated that it was "not going to bend the time so that we can keep playing this game of he's going to get an expert, he's going to get an expert, and then no expert." (Aug. 12, 2021 Tr. at 4).

**{¶8}** The court inquired into the purpose for an expert. (Aug. 12, 2021 Tr. at 4). Defense counsel explained that it was to address the potential transferability of semen and bodily fluids through nonsexual means. (Aug. 12, 2021 Tr. at 4). Counsel stated that he tried to contact potential experts during the COVID-19 lockdown, but offices were closed or they were not accepting cases. (Aug. 12, 2021 Tr. at 5).

**{¶9}** The trial court read its November 2020 note which indicated that Appellant had declined a plea offer and stated that he wished to hire an expert. (Aug. 12, 2021 Tr.

at 5). The court concluded that Appellant therefore knew that he would have to pay for an expert almost a year ago. (Aug. 12, 2021 Tr. at 5). The court also explained that DNA evidence is submitted to the Bureau of Criminal Investigation (BCI) and BCI made independent assessments of the evidence which sometimes favored defendants. (Aug. 12, 2021 Tr. at 6).

**{¶10}** The court denied Appellant's request to continue the trial date, finding that Appellant had not shown that hiring an expert would present any more value than having his counsel cross-examine the BCI witness and results at trial. (Aug. 12, 2021 Tr. at 7). The court concluded that, "It's not a right you have to hire an expert. It's a privilege, if you will, if you can afford it. And he could afford you, so he could afford whatever else he wants to do. So I'm not inclined to move this or to grant a lot of leeway with that." (Aug. 12, 2021 Tr. at 7).

**{¶11}** The court stated that it would reconsider if Appellant notified the court within the next week that the friend gave counsel money to hire an expert. (Aug. 12, 2021 Tr. at 7). The court asked to be kept updated. (Aug. 12, 2021 Tr. at 8).

**{¶12}** On September 16, 2021, Appellant, through counsel, filed a motion for the payment of expert witness fees. Appellant asserted that he wished to retain an expert for DNA and/or a Sexual Assault Nurse Examiner (SANE). He requested fees up to $8,500 to be paid by the State. Appellant explained that he privately retained counsel through a reduced payment plan and he was in jail and indigent. He indicated that the State was going to introduce DNA evidence, forensic evaluations, and SANE examinations at trial, and the only way that he could properly prepare his defense was to retain expert witnesses in these areas. He explained that neither he nor his family could afford such services, and the family friend could no longer help him pay.

**{¶13}** On September 16, 2021, the trial court also held a pretrial. (Sept. 16, 2021 Tr. at 2). Appellant's counsel stated that he spoke to the family friend and he was no longer able to pay legal and expert fees. (Sept. 16, 2021 Tr. at 2-3). Counsel asked to be appointed as legal counsel for Appellant. (Sept. 16, 2021 Tr. at 3). The trial court inquired of Appellant as to income sources and appointed Appellant's attorney as legal counsel. (Sept. 16, 2021 Tr. at 6-7). The court explained that it would allow the State to submit a brief on the issue of appointing an expert. (Sept. 16, 2021 Tr. at 7).

**{¶14}** On September 27, 2021, the trial court denied Appellant's motion for payment of expert witness fees. (Sept. 27, 2021 J.E.).

**{¶15}** The trial began on October 18, 2021. Joann Mauch testified for the State. She testified that K.F. and A.R. volunteered at her thrift store after Appellant was assigned to her business through a work program. (Tr. at 349). She stated that she was working with K.F. and A.R. at the store on June 18, 2019 when K.F. asked to speak to her. (Tr. at 349). Mrs. Mauch testified that K.F. began crying and told her that Appellant had raped her the night before and had been molesting her and A.R. for some time. (Tr. at 349). Mrs. Mauch stated that they called the police, the police came to the store, and Mrs. Mauch made a statement to the police. (Tr. at 352). She testified that K.F. and A.R. left with the police. (Tr. at 352-353).

**{¶16}** K.F. testified that she was 18 years old and attending college. (Tr. at 367). She stated that she had lived with her mother in Oregon and then she, A.R., Z.R. and W.R., her brother, came to Ohio when she was 13 or 14 to live with Appellant, her stepfather. (Tr. at 370). She recalled that Appellant's girlfriend lived with them and Appellant and his girlfriend had children together. (Tr. at 373). K.F. testified that Appellant and his girlfriend slept in the bedroom on the first floor, while she, A.R. and Z.R. shared a room upstairs. (Tr. at 373). W.R. and the girlfriend's other son shared a bedroom on the second floor as well. (Tr. at 373).

**{¶17}** K.F. testified that Appellant was abusive, but his girlfriend was not. (Tr. at 374). She stated that he would yell at and push her, and once he grabbed her by the hair, dragged her down two flights of stairs, shoved her against a wall, and hit her. (Tr. at 375). She stated that little things made him angry, like inadequately washing dishes or sweeping floors. (Tr. at 377). She testified that Appellant told her that things that happened in their house stayed in the house and he threatened harm if she spoke about things that occurred in the home. (Tr. at 378).

**{¶18}** K.F. stated that after Appellant's girlfriend moved out, Appellant was less angry at first, but by December 2018, he made her move into his bedroom and sleep in bed with him. (Tr. at 380-381). She recalled an instance where she was watching television on the couch and Appellant made her take off her bottoms, lay on the couch, and touch her vagina. (Tr. at 381-382). She stated that she had no choice because

Appellant sounded aggressive. (Tr. at 382). She testified that Appellant watched her, left to go into the kitchen, returned, and watched again, and then he touched her vagina. (Tr. at 383).

**{¶19}** K.F. testified that after this encounter, abuse happened more frequently. (Tr. at 384). She stated that Appellant began touching her breasts and her vagina, and put his penis into her vagina. (Tr. at 384-385). She said that the first time that they had sexual intercourse, she was scared, told him no and tried to resist, but Appellant told her that if she wanted to do things like get a car and drive with her friends, she had to act like an adult and do adult things. (Tr. at 385-386). He also told her that sex helped with her acne. (Tr. at 386). She testified that sexual intercourse began happening every night or every other night. (Tr. at 386-387). She stated that he would not wear a condom and made her go to Planned Parenthood to get the Depo Provera shot. (Tr. at 387). She testified that he made her touch his penis with her hands, have oral sex with him, and he would ejaculate in her mouth or on her face. (Tr. at 388). She stated that he also put his mouth on her vagina. (Tr. at 388).

**{¶20}** K.F. also recalled walking into Appellant's bedroom and seeing Appellant with his pants down with A.R.'s face near his groin. (Tr. at 390). She testified that she asked A.R. if Appellant was sexually assaulting her too, and A.R. responded yes. (Tr. at 391). K.F. began to fear that Appellant would also start assaulting Z.R. (Tr. at 391).

**{¶21}** K.F. estimated that Appellant forced her to have sexual intercourse at least 15 times per month and they would perform oral sex at least 10 times per month from December 2018 to June 2019. (Tr. at 396-397).

**{¶22}** K.F. recalled confronting Appellant about A.R. and he said that he was helping her with her menstrual cycle. (Tr. at 398). She stated that after she confronted him, he stopped intercourse with A.R., except for one other time. (Tr. at 398). K.F. testified that she waited seven months before reporting the abuse because she had no one to tell and she was afraid to report it since the last time she called Children Services, they did nothing and Appellant hit her. (Tr. at 399-401). She was afraid of Appellant, afraid to leave her siblings, and afraid that Appellant would hurt them. (Tr. at 399).

**{¶23}** K.F. recalled that on June 18, 2019, she was volunteering at Mrs. Mauch's thrift store with A.R. and decided to tell Mrs. Mauch about the abuse. (Tr. at 404). K.F.

related that she and A.R. would go to church with Mr. and Mrs. Mauch and she felt that she could trust them. (Tr. at 404).

**{¶24}** K.F. testified that she had physical evidence of rape as Appellant had sexual intercourse with her the night before she disclosed and she did not shower and did not change her underwear so she could preserve Appellant's DNA. (Tr. at 405). She testified that she watched *NCIS* and *Law and Order: Special Victims Unit*, and she obtained physical evidence because she worried that no one would believe her since no one believed her when she reported the physical abuse. (Tr. at 405-406).

**{¶25}** On cross-examination, K.F. recalled being homeless with her mom because her mom had a serious drug addiction. (Tr. at 413). She stated that all of the children were removed from her mom's care and lived in a foster home before Appellant came to visit in 2016. (Tr. at 416-419). She testified that this visit was the first time she saw Appellant since she was little. (Tr. at 419). When asked if she accused her foster parents of abusing her and her siblings, she did not recall. (Tr. at 419).

**{¶26}** K.F. stated that a few days after meeting her stepfather, they left to live with him in Ohio. (Tr. at 419). She testified that Appellant was very strict, she had many chores, and he was very strict about homework. (Tr. at 420). She acknowledged calling Children Services in February 2017 to report that Appellant was abusing her and her siblings. (Tr. at 420). She recalled attending Chaney High School and getting suspended for fighting a girl who bullied her. (Tr. at 423). K.F. also remembered that she and A.R. ran away and when they were found, she accused Appellant of abusing her and her siblings. (Tr. at 424). She did not recall what happened with Children Services after that because she was sent to juvenile detention for violating probation by leaving the house. (Tr. at 424). She was on probation for the fight. (Tr. at 424).

**{¶27}** K.F. stated that when she returned home, Appellant took her electronic devices and she had to give her passwords to Appellant and his girlfriend. (Tr. at 425). She acknowledged that they found explicit photos on her devices. (Tr. at 426). She stated that Appellant banned her from all electronics and social media. (Tr. at 426-427).

**{¶28}** When asked about her report to Children Services that Appellant removed her privileges because she refused his sexual favors, K.F. admitted that Appellant had revoked her privileges before he requested sexual favors, but she stated that they were

also removed because of her refusal. (Tr. at 427-428). K.F. did not recall if she told the caseworker that the first sexual incident was when Appellant made her masturbate on the couch. (Tr. at 431). Appellant's counsel noted that the caseworker reported that K.F. recalled the first sexual incident as a time when she refused to have sex with Appellant and he punched her in the face. (Tr. at 432).

**{¶29}** Appellant's counsel asked why K.F. waited to report the sexual abuse. (Tr. at 435-441). Appellant's counsel noted that while K.F. stated that she had no one to disclose the abuse to, she could have told the Mauchs earlier, her pastor, Chaney teachers, guidance counselors, or principals, or Appellant's former girlfriend. (Tr. at 435-441). Counsel also asked about K.F.'s testimony that she put her underwear back on after having intercourse with Appellant to preserve evidence, since she reported to Children Services that she put those underwear in a bag and put on a new pair. (Tr. at 445-446). Counsel also asked about A.R. preserving evidence of Appellant's DNA on a Q-tip on the same day that K.F. kept her underwear. (Tr. at 450).

**{¶30}** On re-direct examination, K.F. testified that she overheard Appellant talking to A.R. and Z.R. about shaving their vaginas. (Tr. at 456). She also heard him talking about looking at their vaginas and telling them to spread their legs. (Tr. at 457).

**{¶31}** Z.R. testified. (Tr. at 468). She stated that she was 16 years old and in eleventh grade. (Tr. at 468-469). She testified that she, K.F., and A.R. shared a room. (Tr. at 472). She stated that Appellant was verbally abusive and would threaten them, but she could not recall the substance of the threats. (Tr. at 474). She explained that he would yell and get angry if they did not perform a chore a certain way or if they woke up the babies he had with his girlfriend. (Tr. at 474). She said that he was not physically violent with her, but he was with W.R., and once with K.F. and A.R. (Tr. at 474-475). She recalled that K.F. and A.R. woke Appellant up when they were arguing, and Appellant punched each of them in the face. (Tr. at 475).

**{¶32}** Z.R. remembered that after Appellant's girlfriend moved out, he moved K.F. to his bedroom partly because he did not trust K.F. and thought she was a bad influence on A.R. (Tr. at 477). She testified that Appellant would make her and A.R. pull down their pants, lie on the bed or on the couch, spread their legs, use their fingers to open their vaginas, and he would look and tell them if they were clean. (Tr. at 479). She did

not recall if he touched her vaginal area. (Tr. at 480). She also recalled Appellant having her and A.R. take off their shirts and he touched their breasts when he measured them for bra sizes. (Tr. at 480-481).

**{¶33}** Z.R. further recalled K.F. telling her that Appellant was raping her and A.R. (Tr. at 481). She knew that they were both on birth control and she recalled Appellant asking her about getting on birth control, but she could not remember why he asked. (Tr. at 482). Z.R. remembered K.F. telling her that Appellant had raped her the night before and she did not want it to happen anymore. (Tr. at 482). Z.R. recalled asking K.F. if K.F. trusted anyone and when K.F. said yes, Z.R. asked K.F. if she was sure because it was "really our only shot" and told K.F. to turn the shower on, splash the walls, get her hair wet, and then go into work like she had showered. (Tr. at 483). Z.R. recalled that later in the day, after K.F. told Mrs. Mauch about the abuse, a police officer arrived at their home to remove them from the home. (Tr. at 483).

**{¶34}** On cross-examination, Z.R. recalled seeing K.F. in the same bed with Appellant and sharing his room. (Tr. at 491). She stated that when she saw them in bed, they were clothed and taking a nap. (Tr. at 495).

**{¶35}** Z.R. testified that beginning in eighth grade, Appellant made her remove her clothing daily to check her hygiene. (Tr. at 497-498). She stated that Appellant did not touch her, but made her touch herself. (Tr. at 498-499). She did not recall telling the caseworker that Appellant would touch her to check her hygiene. (Tr. at 499). She also stated that K.F. and A.R. were present when Appellant made her remove her shirt to measure her for a bra. (Tr. at 499).

**{¶36}** Z.R. recalled seeing K.F. place her underwear in a bag the day that K.F. reported the abuse and she saw the Q-tip that A.R. had used. (Tr. at 502). She stated that A.R. told her that Appellant was sexually assaulting her, but she did not disclose details. (Tr. at 501-502). She testified that she never saw K.F. or A.R. naked with Appellant. (Tr. at 503-504).

**{¶37}** A.R. then testified. (Tr. at 509). She stated that she was in eleventh grade and recalled living with her mother in Oregon, going to foster care, and then moving to Ohio to live with Appellant. (Tr. at 511). She testified that when they moved to Youngstown, the girls slept in the same room and Appellant and his girlfriend slept

downstairs. (Tr. at 513). She said the environment was "[n]ot very pleasant" because Appellant loved to yell and K.F. liked to fight back. (Tr. at 513). She stated that Appellant yelled over small things, like the way that they performed chores, their grades, or how they spoke. (Tr. at 513). She stated that he swore at them and compared them to their mother. (Tr. at 514).

**{¶38}** A.R. remembered Appellant throwing her and punching her in the face. (Tr. at 514). She said that Appellant often hit K.F. and W.R. (Tr. at 515). She recalled Appellant telling them that things that happen in the house were secret. (Tr. at 515). She stated that she and K.F. ran away to tell the police about the abuse, but K.F. got arrested. (Tr. at 516). A.R. testified that after Appellant's girlfriend moved out, K.F. moved to Appellant's bedroom, where there was only one bed. (Tr. at 517).

**{¶39}** A.R. further testified that Appellant would have her and Z.R. take off their clothes and he would check their bodies, from their armpits to their vaginas. (Tr. at 518). She recalled that she would have to lay on her bed and he would have her put up her legs on the edge of the bed and touch her vaginal area to check her hygiene. (Tr. at 518). She stated that Appellant then started touching her breasts, had her touch his penis and testicles, he would touch inside her vagina, and he touched her vagina with his penis, but he could not penetrate her. (Tr. at 520-521). A.R. testified that Appellant put his mouth on her vagina and he touched his penis with her mouth. (Tr. at 521). She estimated that these acts happened 37 times per month and began shortly after Appellant's girlfriend moved out of the house. (Tr. at 521).

**{¶40}** A.R. stated that the abuse began after she missed a period and Appellant told her that the only two solutions were to go to the doctor or Appellant could do it. (Tr. at 522). She said that Appellant told her that he had to check by using his fingers, and then it progressed with him trying to penetrate her vagina with his penis. (Tr. at 523). She testified that he ejaculated on her vaginal area or in her mouth and he would either make her shower or she would swallow his semen and drink juice. (Tr. at 523). She calculated that he put his penis in her mouth, put his mouth on her vagina, and put his fingers inside of her vagina at least once per month as to each act, and he tried to put his penis in her vagina at least once. (Tr. at 523).

**{¶41}** She also remembered two occasions when sexual acts occurred outside of the house. (Tr. at 525). She recalled being in a car with Appellant in the driveway of his girlfriend's house when he ejaculated on her vaginal area. (Tr. at 525). A.R. stated that Appellant got her on birth control so that she would not get pregnant. (Tr. at 526). She testified that she never saw Appellant sexually assault any of her siblings, but K.F. saw her sitting on the edge of the bed with Appellant standing over her with his pants unbuckled. (Tr. at 527).

**{¶42}** A.R. explained how she, K.F., and Z.R. discussed how to gather evidence of the sexual abuse. (Tr. at 529). She stated that she had been collecting DNA evidence from the first sexual incident. (Tr. at 529). She testified that when Appellant sent her to shower after sexual acts, she would collect his semen on Q-tips and place them in a Ziploc bag. (Tr. at 529). A.R. further testified that she did not believe that she could say no to Appellant. (Tr. at 534).

**{¶43}** On cross-examination, A.R. testified that she was very young when her parents separated and she met Appellant in 2016 when he flew to Oregon to meet her and her siblings. (Tr. at 537). She was in sixth grade when she came to Ohio with Appellant. (Tr. at 538). She remembered K.F. reporting that Appellant was physically abusing them and she remembered talking to a caseworker about it. (Tr. at 539). She did not remember telling the caseworker that the abuse was not true. (Tr. at 539).

**{¶44}** A.R. also recalled trying to tell teachers at school about the abuse, but she said that Appellant would appear before she could. (Tr. at 541). She acknowledged that Appellant was very strict about chores, homework, and attending school, which was very different than living with her mother. (Tr. at 545-546). She admitted she did not like the changes and wanted to move back with her mom. (Tr. at 546). She also stated that she got the Q-tip idea from *CSI* and *Law & Order*. (Tr. at 546).

**{¶45}** When asked about 37 assaults per month, A.R. testified that it was probably not each month. (Tr. at 549). She stated that the assaults occurred for a full year, but did not recall telling Children Services that the assaults had been happening for three months. (Tr. at 551). She stated that she told no one about the assaults even though she had teachers, guidance counselors and principals available. (Tr. at 557).

**{¶46}** Officer Bokesch from the Youngstown Police Department testified. (Tr. at 585). He responded to Mrs. Mauch's phone call and K.F. told him that Appellant was sexually abusing her, they had intercourse the night before, Appellant ejaculated inside of her, and she did not take a shower. (Tr. at 589).

**{¶47}** Officer Bokesch testified that he also spoke to A.R., who told him that Appellant was sexually abusing her and had last done so a few days prior in a car. (Tr. at 590). An ambulance was called and the family unit services of the police department also arrived at the scene. (Tr. at 591). He stated that the ambulance took K.F. and A.R. to the hospital and he went to Appellant's house with family services officers and a Children Services caseworker to investigate and remove other children. (Tr. at 594).

**{¶48}** The State called Rebecca Haddle, a Mahoning County Children Services caseworker, who testified that she responded after the police called and she and her coworker rode in the ambulance with K.F. and A.R. to the hospital. (Tr. at 604, 606).

**{¶49}** She testified that K.F. disclosed that Appellant had been having sexual intercourse with her every night since December 2018. (Tr. at 607). She stated that K.F. disclosed that she had intercourse with Appellant the night before, he ejaculated inside her vagina, she had not showered, and she was wearing the same underwear. (Tr. at 607). Ms. Haddle noted that K.F. was crying and shaking. (Tr. at 607-608).

**{¶50}** Ms. Haddle also testified that she spoke to A.R. and A.R. disclosed that Appellant had been sexually abusing her since March 2019, with the last time on June 11, 2019 when he tried to penetrate her vagina with his penis in a car, but his penis would not fit. (Tr. at 608). A.R. told her that Appellant then masturbated and ejaculated. (Tr. at 608).

**{¶51}** Ms. Haddle explained that the day after she spoke to the girls, they went to the Child Advocacy Center at Akron Children's Hospital, where they were interviewed by a social worker. (Tr. at 610-611). She stated that she watched the interviews from another room and noted that K.F.'s and A.R.'s reports to her were very consistent with the information they provided to the social worker. (Tr. at 611-612).

**{¶52}** When asked about prior Children Services involvement, Ms. Haddle stated that there were two prior referrals, one for emotional maltreatment and physical abuse and the other for physical abuse. (Tr. at 612). She noted that the cases were alternative

response cases, where they worked with the family and there is no disposition on the case. (Tr. at 612). She stated that Appellant refused entry into the home during both referrals and barred access to speak to the children. (Tr. at 612).

**{¶53}** Christine Begalla, R.N., testified for the State. (Tr. at 635). She indicated that she was a SANE nurse and performed a rape kit on K.F., examined A.R., and talked to both girls. (Tr. at 646-646). She explained that in order to gather viable samples of DNA in children, the sample would have to be taken within 72 hours of the sexual assault. (Tr. at 643).

**{¶54}** Nurse Begalla related that K.F. told her that Appellant forced her to have sex every night or every other night since December 2018. (Tr. at 650). K.F. stated that Appellant said that it was treatment for her acne. (Tr. at 650). Nurse Begalla testified that K.F. told her that the night before she disclosed the abuse, Appellant told her to go to their bedroom and take off her bottoms, he pulled his pants down, and forced himself on her and ejaculated inside of her. (Tr. at 650). Nurse Begalla stated that K.F. reported that Appellant then told her to get up, wipe herself with a rag, and he rinsed the rag out with water. (Tr. at 650).

**{¶55}** Nurse Begalla stated that K.F. reported that Appellant also forced her to have oral sex with him and he forced oral sex on her. (Tr. at 651). She reported that the first time Appellant abused her, she refused, he hit her and told her that she had no privileges and no cell phone. (Tr. at 651).

**{¶56}** Nurse Begalla discussed the rape kit and noted that K.F. had no injury to her body from the assault. (Tr. at 652-653). She explained that she swabbed various parts of K.F.'s body and she took K.F.'s underwear. (Tr. at 657-658). Nurse Begalla stated that the rape kit and underwear were in her custody until she sealed the kit and gave the kit and underwear to the Youngstown Police Department. (Tr. at 666).

**{¶57}** Nurse Begalla testified that A.R. reported that Appellant's sexual assaults of her began in March 2019 after she missed her period. (Tr. at 662). She told Nurse Begalla that Appellant told her that sex would help her because she was underweight. (Tr. at 662). She stated that Appellant kept her home from school, told her to take off her clothes, put her on the bed, and forced himself on her, but he could not fit his penis into

her vagina, so he masturbated and then ejaculated inside of her. (Tr. at 662). A.R. had told Nurse Begalla that this happened every other day.

**{¶58}** Nurse Begalla testified that A.R. also told her that K.F. discovered her abuse and yelled at Appellant, and he stopped for some time. (Tr. at 663). A.R. stated that on June 11, 2019, Appellant told her they were going to the neighbor's house to cut grass. (Tr. at 663). He stated that Appellant drove there while she had to walk. (Tr. at 663). A.R. reported that Appellant told her to get in the back seat of the car, take off her shorts and underwear, and he forced himself on her. (Tr. at 663). A.R. told her that Appellant set his phone timer for five minutes after and told her to hold her hips up in the air for five minutes. (Tr. at 663). She stated that he then left to mow the grass, and before she got dressed, she put his DNA on the seat and seatbelt. (Tr. at 663). A.R. reported to Nurse Begalla that K.F. told her that they had to report the abuse because Appellant "had to do it with someone, so if they wouldn't let him, he would go to one [sic] younger siblings, our sister [Z.R.]" (Tr. at 663).

**{¶59}** Nurse Begalla explained that she did not perform a rape kit on A.R. because it was out of the 72-hour timeframe for collection, but she did examine A.R. and asked if she had any injuries, which she did not. (Tr. at 664).

**{¶60}** Officer Brandon Caraway testified that he was a family investigative services officer for the Youngstown Police Department and he served the search warrant on September 10, 2019 to take mouth swabs of Appellant for DNA. (Tr. at 727). He reported that he also helped remove Z.R. and W.R. from Appellant's home and he watched the interviews of all four children at the Children's Advocacy Center. (Tr. at 715-718, 722). He testified that K.F., A.R., and Z.R. disclosed sexual abuse by Appellant, and W.R. disclosed physical abuse. (Tr. at 723).

**{¶61}** On cross-examination, Officer Caraway testified that he did not obtain warrants or investigate Appellant's bed, his car, or his home, because Appellant's DNA, and even his semen, could be on all of those surfaces since Appellant owned and used them. (Tr. at 765-766). He also explained that he did not speak to Appellant's former girlfriend about witnessing sexual abuse because the abuse reports pertained to sexual abuse which occurred after she left the home. (Tr. at 766).

**{¶62}** Brittani Troyer testified for the State. (Tr. at 774). She stated that she was employed by Ohio BCI as a forensic scientist in the forensic biology DNA section. (Tr. at 775). She performed some of the scientific analysis on items submitted in the instant case and she submitted reports related to those analyses. (Tr. at 781).

**{¶63}** Ms. Troyer stated that the first analysis and report pertained to K.F.'s underwear and rape kit, which included vaginal and anal samples. (Tr. at 782, 785). She reported that the samples contained K.F.'s DNA as an expected contributor. (Tr. at 789). She also reported that all three samples contained DNA from an unknown male. (Tr. at 789). Ms. Troyer explained that when she processed those samples, she had no male DNA to compare. (Tr. at 790). However, she was able to conclude that it was the same male DNA in all three samples. (Tr. at 790).

**{¶64}** Ms. Troyer testified that after she obtained Appellant's mouth swab samples, she generated a second report. (Tr. at 791). She reported that she compared the sample from Appellant to K.F.'s samples and found that Appellant was included as a contributor to all three of the samples. (Tr. at 792). She concluded that while sperm cells were not visualized in the samples, the samples were positive for acid phosphatase, which is present in semen. (Tr. at 793-794). Ms. Troyer estimated that the frequency of occurrence of the DNA profile found on the samples in the sperm fraction was rarer than one in one-trillion unrelated individuals. (Tr. at 793). She explained that this meant that a scientist would have to test more than the world's total population (7.8 billion) in order to find another individual that fit the DNA profile found on the evidence samples. (Tr. at 794).

**{¶65}** On cross-examination, Ms. Troyer acknowledged that DNA can be transferred rather easily. (Tr. at 799). She also stated that DNA was not just present in semen as semen itself is a fluid that carries cells that have DNA. (Tr. at 799). She agreed that it was possible that if a man and woman were having sexual intercourse and a man cleaned himself off with a towel, his DNA could transfer to another person if they used the towel. (Tr. at 802).

**{¶66}** Ms. Troyer further acknowledged that if K.F.'s underwear was placed in a bag and that bag had been used before, DNA could be indirectly transferred onto the underwear from the bag. (Tr. at 804). She also conceded that DNA could transfer from

a tissue to the underwear if a person blew their nose into the tissue, threw the tissue into the garbage, and someone placed the underwear on top of the tissue. (Tr. at 804).

**{¶67}** She further agreed that a woman's own vaginal secretions could test positive for acid phosphatase, as could saliva, blood and bacteria. (Tr. at 806). She stated that the analyses that she conducted did not include one for semen, so a positive semen result was not on her report. (Tr. at 807). Ms. Troyer testified that she could not conclusively state to a scientific certainty that semen was present in the samples that she tested in this case. (Tr. at 810).

**{¶68}** On redirect examination, Ms. Troyer opined that it was more likely that the sperm fraction present in the samples in this case came from semen and not transfer DNA. (Tr. at 813). She explained that she did not perform other tests to determine if semen was actually present because DNA testing is more sensitive and better at collecting results than just looking for sperm cells. (Tr. at 814).

**{¶69}** Monique Malmer, Certified Nurse Practitioner (CNP) for Akron Children's Hospital, testified for the State. (Tr. at 863). She stated that she physically examined K.F., A.R. and Z.R., reviewed their histories, and observed their interviews with the social worker. (Tr. at 872). She stated that she examined K.F. based upon the report from Children Services that was concerning for sexual abuse. (Tr. at 872-873). She testified that K.F. reported numerous instances and methods of sexual abuse by Appellant. (Tr. at 875). She testified that her physical examination of K.F. produced normal results, which was not unusual in cases of sexual abuse. (Tr. at 876-877). She diagnosed child sexual abuse. (Tr. at 877).

**{¶70}** CNP Malmer also spoke to and examined A.R. and diagnosed sexual abuse based upon reports, even though A.R.'s physical examination also had normal results. (Tr. at 888).

**{¶71}** CNP Malmer testified that she spoke to and examined Z.R. and created a report. (Tr. at 889). She noted Z.R.'s reports about Appellant having her spread her legs and expose her vagina to him to check her periods and hygiene. She believed that these were grooming behaviors. (Tr. at 890, 892-894). She rendered a diagnosis of sexual abuse for Z.R. (Tr. at 893).

**{¶72}** Andrea Hover testified on Appellant's behalf. (Tr. at 945). She stated that she knew Appellant because he and his family would shop in her son's corner store and she worked there. (Tr. at 946). She did not know the children by name, but knew who they were. (Tr. at 947). She recalled very good interactions between Appellant and his children and she saw the girls at the store sometimes without Appellant. (Tr. at 948). She stated that Appellant was a strict father and he did not let the children run the streets. (Tr. at 949-951). She never observed any bruising on the children. (Tr. at 949-951).

**{¶73}** Appellant took the stand in his own defense. (Tr. at 963). He testified that he did not know his children prior to getting custody of them. (Tr. at 965). He was married to their mother and lived with her, but the relationship ended when K.F. was four years old and Z.R. was a newborn. (Tr. at 965). He stated that their mother left with the children and went to California, and then to Oregon and he was told that the children did not need him. (Tr. at 965). He tried to remain in touch, but was not successful. (Tr. at 965). He did not have money to pursue custody. (Tr. at 967).

**{¶74}** Appellant explained that he regained custody of the children in December 2016 after Oregon Children Services sent him a letter stating that the children were in foster care there. (Tr. at 967). He spoke to the children on the phone and flew to Oregon on December 13, 2016 to see them for the first time in 10 years. (Tr. at 968). He testified that the children told him that they were homeless when with their mother and they slept on floors of drug houses. (Tr. at 972). He stated that the children also told him that their foster sibling hit them and took their food and they did not want to return there. (Tr. at 969).

**{¶75}** Appellant testified that after three days in Oregon, the children were released to his custody. (Tr. at 970). He stated that he had rules for the children, such as making their beds before school, eating breakfast, brushing their teeth, and attending school. (Tr. at 973). He explained that they had not gone to school when they lived with their mother. (Tr. at 975). Appellant related that if the children brought home bad grades, they could not do homework in their rooms. (Tr. at 975). He testified that he never hit the children for bad grades. (Tr. at 976).

**{¶76}** He testified that two months after gaining custody, Children Services opened an investigation after K.F. and A.R. failed to come home from school with the

other children on the bus. (Tr. at 977). He stated that he and his girlfriend frantically looked for them, and found them at school. (Tr. at 977). He indicated that school officials, Children Services, and the police were there waiting for him as the girls had reported that he beat them and whipped W.R. with a belt. (Tr. at 978). He explained that the caseworker came to his house and then closed the case. (Tr. at 979).

**{¶77}** Appellant testified that they moved to Mahoning County in 2017 because he found a bigger home. (Tr. at 979). He reported that the children's grades were better in the new schools. (Tr. at 981). He stated that K.F. then got in trouble at Chaney for fighting after a girl was bullying her. (Tr. at 981). She was suspended and the girl's parents pressed charges, so she was placed on juvenile probation and house arrest. (Tr. at 982). He testified that he was proud that K.F. stood up for herself, but he did not encourage fighting. (Tr. at 982). He stated that he punished K.F. by limiting her to going to church and volunteering at Mrs. Mauch's store. (Tr. at 982).

**{¶78}** Appellant recalled when K.F. and A.R. ran away from home and were found at a friend's house the next morning. (Tr. at 984). He testified that K.F. told police that they ran away because he was beating W.R. (Tr. at 986). He stated that Children Services came to his home and he told the caseworker that the children had behavioral problems because they lacked structure while living with their mother and they had no food to eat regularly and did not attend school on a daily basis. (Tr. at 986). He testified that he first refused to allow the caseworker to enter his home, but after allowed her to enter, she told him that he had one of the nicer homes that she had seen. (Tr. at 987).

**{¶79}** Appellant testified that when he picked K.F. up from juvenile detention for violating her probation, they argued because she wanted to live at a homeless shelter for teenagers. (Tr. at 989). He grounded K.F. by taking away television, her cell phone, and her tablet. (Tr. at 989). He stated that his girlfriend obtained K.F.'s passwords and she found nude pictures of males and pictures of K.F. on the devices. (Tr. at 990). He called the police and gave them the devices. (Tr. at 990). K.F. had to attend a class on sending nude pictures over the internet for the delinquency charges against her to be dismissed. (Tr. at 990-991). Appellant testified that K.F. was no longer allowed on social media and was not allowed to have her cell phone. (Tr. at 992).

**{¶80}** Appellant also explained that he put K.F. and A.R. on birth control after they returned from running away because he had past experience with pregnancy at a young age. (Tr. at 993). He testified that his girlfriend moved out of the house because of the arguments about K.F. and A.R. (Tr. at 994). He related that his girlfriend also became jealous because women at the thrift store talked about him and what a nice guy he was. (Tr. at 995).

**{¶81}** Appellant testified that after the girls ran away, he moved K.F. out of the girls' bedroom and put her in the babies' room because the babies usually slept in bassinets in the downstairs bedroom. (Tr. at 996). He explained that K.F. and A.R. blamed each other for running away and he moved K.F. because she was older. (Tr. at 997). Appellant stated that he did not make K.F. move into his bedroom and he never shared a bedroom with any of the children. (Tr. at 998).

**{¶82}** He further testified that he tried to contact K.F.'s mother to send her back. (Tr. at 997). He said that K.F. did not want to live with him and he would not let her stay at a shelter when she had a home, food to eat, and clothes to wear. (Tr. at 997).

**{¶83}** Appellant recalled June 18, 2019 as a day where the girls were going to help him with his children with the former girlfriend, who were coming to stay. (Tr. at 999). He stated that having the girls watch the babies was good birth control. (Tr. at 999). He related that he dropped the girls off the following Tuesday to volunteer with Mrs. Mauch and he went to work. (Tr. at 999). He stated that when he arrived home, Z.R. was making dinner and he noticed police cars on the baby monitor screen that he positioned outside of his house. (Tr. at 999). He testified that Officer Caraway approached him and said he was there to discuss abuse claims and Appellant related that the girls had made two prior false reports, but he would cooperate. (Tr. at 999).

**{¶84}** He said that Officer Caraway told him that the allegations were sexual and Z.R. and W.R. had to leave the house for a few days. (Tr. at 1001). Appellant complied and said that the officer did not look around in the house or in his car. (Tr. at 1001).

**{¶85}** He stated that the next time he heard from the police was September 2019 when they had a warrant for his DNA. (Tr. at 1002). He indicated that he had contact with Children Services' caseworkers during that time, and the children were taken through an emergency temporary custody order from juvenile court. (Tr. at 1004). Appellant

stated he did nothing wrong, he was a strict parent, and he was not worried about any accusations. (Tr. at 1005).

**{¶86}** Appellant's counsel asked him if he ever had sexual intercourse with K.F. (Tr. at 1006). He responded that he had never done so. (Tr. at 1006). He stated that he never had oral intercourse with her or forced her to engage in any type of sexual conduct. (Tr. at 1006-1007). He stated the same as to A.R. (Tr. at 1007). He testified that he never forced Z.R. or A.R. to strip to check their hygiene and he never measured their breasts for bra sizes. (Tr. at 1007). He testified that he complained that their tops were too low and he was strict about the way that they dressed. (Tr. at 1007-08). He testified that he never performed sex acts on himself in front of the girls and he never smacked their behinds or grabbed them inappropriately. (Tr. at 1008). He stated that he was not a touchy guy. (Tr. at 1009). He further testified that he never punched any of the children or whipped them with a belt. (Tr. at 1009). He stated that he punished them by grounding them, removing privileges, or not letting them stay up for movie night. (Tr. at 1009-1010).

**{¶87}** He related that after the children were removed, his father told him that the children were trying to contact him and his wife through social media. (Tr. at 1010). He called the caseworker to let him know since K.F. should not be on social media. (Tr. at 1010-1011).

**{¶88}** On October 22, 2021, the jury found appellant guilty on all charges, which were 33 counts of rape, 33 counts of sexual battery, 1 count of attempted rape, and 6 counts of gross sexual imposition.

**{¶89}** The court held a sentencing hearing and on January 6, 2022, filed a judgment entry sentencing appellant to: 10 years of imprisonment on Counts 1, 2, and 3, to be served consecutively; 10 years of imprisonment on Counts 4-21 to be served concurrently to all other sentences; no sentence for Counts 22-42 since those Counts merged into Counts 1-21; 18 months of imprisonment each for Counts 43-44, to run consecutively to Counts 1-3, but concurrently with the rest of the sentences; 7 years of imprisonment on Count 45, to run consecutively to the sentences imposed for Counts 1-3 and 43-44; 10 years of imprisonment each for Counts 46-48, to be served consecutively to the sentences imposed for Counts 1-3, and 43-44; 10 years each for Counts 49-59, to be served concurrently to one another and the other sentences imposed; no sentence for

Counts 58-69 due to merger with Counts 46-57; 18 months of imprisonment each for Counts 70-71, to run consecutively to the sentences imposed in Counts 1-3, 43-44, and 46-48; and 18 months of imprisonment each for Counts 72 and 73, to be served consecutively to all of the other sentences. (Sent. Tr. at 31-39). Appellant was sentenced to a total of 77 years in prison and designated a Tier III Sex Offender. (Jan. 6, 2022 J.E.).

**{¶90}** On January 7, 2022, Appellant filed a notice of appeal asserting two assignments of error.

**{¶91}** Appellant's first assignment of error states:

> **THE DEFENDANT WAS DENIED A FAIR TRIAL BY THE COURT FAILING TO PROVIDE DEFENDANT WITH A DNA EXPERT.**

**{¶92}** Appellant asserts that the trial court erred by denying his requests for a DNA expert. He explains that his counsel informed the court at the August 12, 2021 hearing that he wanted a DNA expert appointed because he could not afford one. (Aug. 12, 2021 hearing Tr. at 2). He also notes that his counsel filed a motion on September 16, 2021 requesting the payment of expert fees and explained why an expert was needed for the defense.

**{¶93}** Appellant submits that the United States Supreme Court and the Ohio Supreme Court have both held that an indigent criminal defendant is entitled to obtain the assistance of an expert witness at the expense of the State under certain conditions. He cites *State v. Mason*, 82 Ohio St.3d 144, 149, 694 N.E.2d 932 (1998) (quoting *Ake v. Oklahoma,* 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53), *Britt v. North Carolina*, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971), and *State v. Broom*, 40 Ohio St.3d 277, 533 N.E.2d 682 (1988) in support.

**{¶94}** He asserts that the standard of review of a trial court's decision to appoint an expert is abuse of discretion. He cites the Ohio Supreme Court's opinion in *Mason*, and argues that he presented a particularized showing of a reasonable probability that an expert would aid in his defense and that the denial of an expert would result in an unfair trial. *Mason, supra.*

**{¶95}** Appellant explains that his defense was that K.F. and A.R. made up allegations of sexual abuse because they did not want to live with his strict rules and

wanted removed from his care. He cites their testimony that they collected evidence before they made their sexual abuse allegations. (Tr. at 344, 529). He also refers to Ms. Troyer's testimony that while he was included as a contributor to the DNA found on K.F.'s vaginal, anal, and underwear samples, sperm cells were not visualized and DNA was easily transferred. (Tr. at 789-794). He asserts that his counsel explained to the court the reasons for hiring an expert in the motion, but the court improperly denied the motion, stating: "It's not a right you have to hire an expert. It's a privilege, if you will, if you can afford it." (Aug. 12, 2021 Tr. at 7).

**{¶96}** Appellee counters that the trial court did not abuse its discretion because Appellant failed to set forth a particularized need for the experts that he requested. Appellee notes that this case was pending for two years, Appellant retained private counsel, and he repeatedly informed the court that he would be securing funds to retain an expert. (Sept. 16, 2021 Tr. at 2-3). Appellee points out that Appellant attended 16 prior pretrial hearings and never requested the appointment of an expert at State expense. Appellee submits that it was only at the final pretrial, 19 days before trial, when Appellant requested that he be declared indigent and appointed legal counsel and a state-funded expert witness.

**{¶97}** Appellee also cites to the Ohio appellate decision in *State v. Howell*, 5th Dist. Delaware No. 15 CAA 12 0098, 2016-Ohio-7749, ¶ 23, where the court held that:

> [a]ttorneys are routinely expected to familiarize themselves with complex issues as they are presented or as they develop in a case. As the State notes in response, we have now reached the point of familiarity with certain scientific advances to at least recognize that there is nothing novel about the use of DNA evidence in criminal cases. Indeed, "[t]here are ample materials available [regarding DNA analysis] by which resourceful counsel can educate himself [or herself] sufficiently to formulate an effective cross-examination."

*See State v. Alltop*, 12th Dist. Fayette No. CA2013-06-018, 2014-Ohio-1695, ¶ 16.

**{¶98}** We find merit to part of Appellant's first assignment of error. In *Ake v. Oklahoma,* 470 U.S. at 76, 105 S.Ct. 1087, 84 L.Ed.2d 53, the United States Supreme

Court held that the due process clause of the Fourteenth Amendment entitled a defendant to the "basic tools" in which to present a defense. The Court held that "when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense." *Id.* This opportunity emanates from the Fourteenth Amendment's fundamental fairness guarantee, which the Court opined, "that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake." The Court held in *Ake* that the basic tools may include a psychiatric expert when a showing is made that a defendant's sanity "will be a significant factor at trial." *Id.* at 74, 105 S.Ct. at 1091, 84 L.Ed.2d at 60.

**{¶99}** In *Mason*, 82 Ohio St.3d at 149, 694 N.E.2d 932, the Ohio Supreme Court recognized the limited holding of the Court in *Ake* to a psychiatric expert, but referred to other courts' expansion of *Ake* to include providing other types of expert assistance to indigent criminal defendants at State expense. *Id.* The Court acknowledged Ake's holding that it was proper to consider the following three factors when determining whether the State must provide an expert to an indigent criminal defendant to present an adequate defense:

> (1) the effect on the defendant's private interest in the accuracy of the trial if the requested service is not provided, (2) the burden on the government's interest if the service is provided, and (3) the probable value of the additional service and the risk of error in the proceeding if the assistance is not provided.

*Id*. at 149, citing *Ake, supra* at 78–79, 105 S.Ct. at 1093–1094, 84 L.Ed.2d at 63. The *Mason* Court emphasized that expert assistance is not required for an indigent defendant for an issue not likely to be significant at trial and an indigent criminal defendant is not entitled to all expert assistance that a wealthier defendant may be able to afford. The Ohio Supreme Court held that the provision of expert assistance entitles a criminal indigent defendant "only to the basic and integral tools necessary to ensure a fair trial." *Id*.

**{¶100}** The *Mason* Court held that:

> The state must provide an indigent criminal defendant with funds to obtain expert assistance when the defendant has made a particularized showing that (1) there exists a reasonable probability that the requested expert would aid the defense and (2) denial of the requested expert assistance would result in an unfair trial.

*Id.* at syllabus.

**{¶101}** In determining whether the trial court erred in denying a request for expert assistance at State expense, we apply the abuse of discretion standard. *Id*. at 944. A trial court abuses its discretion when its decision is unreasonable, arbitrary or unconscionable. *AAAA Ents, Inc. v. River Place Community Urban Redev. Corp*., 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). An unreasonable decision lacks the support of any sound reasoning process. *Id*. An arbitrary decision is made without consideration of the facts or circumstances. *State v. Beasley*, 152 Ohio St.3d 470, 2018-Ohio-16, 97 N.E.3d 474, ¶ 12. An unconscionable decision is one that affronts "the sense of justice, decency, or reasonableness." *Hise v. Laiviera*, 7th Dist. Monroe No. 18 MO 0010, 2018-Ohio-5399, ¶ 29, quoting *State v. Waugh*, 10th Dist. Franklin No. 07AP-619, 2008-Ohio-2289, ¶ 13.

**{¶102}** In this case, we find that the trial court abused its discretion by denying Appellant's motion for a DNA expert at the State's expense.

**{¶103}** Of the 73 counts in which Appellant was convicted, 67 were for rape, attempted rape, and sexual battery. Relevant to those offenses, the State presented lab reports and a DNA expert who testified that Appellant's DNA was included as a contributor to the underwear, vaginal, and anal samples from K.F. (Tr. at 792). She estimated that the frequency of occurrence of the DNA profile found on the samples in the sperm fraction was rarer than one in one-trillion unrelated individuals, which meant that a scientist would have to test more than the world's total population (7.8 billion) to find another individual that fit the DNA profile found on the evidence samples. (Tr. at 793-794).

**{¶104}** However, Ms. Troyer testified that she could not conclusively state to a scientific certainty that semen was present in the samples tested. (Tr. at 810). She stated that while sperm cells were not visualized in the samples, the samples were positive for acid phosphatase, which is present in semen. (Tr. at 793-794). She explained that she did not perform other tests to determine if semen was actually present because DNA testing is more sensitive and better at collecting results than just looking for sperm cells. (Tr. at 814).

**{¶105}** Further, Ms. Troyer testified that DNA was not just present in semen as semen itself is a fluid that carries cells that have DNA. (Tr. at 799). She acknowledged that a woman's own vaginal secretions could test positive for acid phosphatase, as could saliva or bacteria. (Tr. at 806). The lab report asterisked the positive acid phosphatase activity and also cautioned that acid phosphatase "is found in semen, saliva, vaginal secretions, and some bacteria." (State's Exhibit 12).

**{¶106}** During cross-examination, Ms. Troyer acknowledged that DNA can transfer easily and could transfer to an item or person if a man cleaned himself off with a towel after sexual intercourse and the item or person came into contact with the towel. (Tr. at 799, 802). She testified that DNA could also transfer to K.F.'s underwear if the underwear was placed in a bag that had been used before. (Tr. at 804). She conceded that DNA could transfer from a tissue to the underwear if a person blew their nose into the tissue, threw the tissue into the garbage, and someone placed the underwear on top of the tissue. (Tr. at 804). She further agreed that it was common for the DNA of the members of a household to be present on each other's clothing and bodies. (Tr. 818). Ms. Troyer indicated that a person could have his daughter's DNA in his underwear or on his pubic region without the two ever touching. (Tr. at 818).

**{¶107}** While defense counsel aptly educated himself on DNA evidence and conducted a suitable cross-examination, a DNA expert for the defense could have aided the defense. A defense DNA expert could have distilled the DNA lab report and Ms. Troyer's complex scientific testimony relating to acid phosphatase and easy transferability of DNA. A DNA expert for Appellant was germane to his defense against the DNA lab report and expert who testified for the State at trial.

**{¶108}** The denial of an expert to Appellant may have impacted the accuracy of the trial and tainted the other convictions in this case. *Mason*, 82 Ohio St.3d at 149, 694 N.E.2d 932, quoting *Ake,* 470 U.S. at 77, 105 S.Ct. 1087, 84 L.Ed.2d 53. A DNA expert may have elucidated the concern for contamination of the evidence and illuminated further information regarding DNA transferability. While defense counsel attempted to accomplish these objectives on cross-examination, he was limited by Ms. Troyer's direct testimony. He was also limited by his own lack of expertise in the area.

**{¶109}** The effect on Appellant's private interest in the accuracy of the trial without his own DNA expert is immense. Without his own DNA expert, he could not effectively counter Ms. Troyer's testimony. Ms. Troyer's testimony certainly had a significant impact on the trial. Further, the burden on the government's interest in providing a DNA expert to Appellant was not onerous, since the fees requested by Appellant were not unreasonable. Moreover, the value of providing the DNA expert is important due to the seriousness and number of charges and the limited and complex testimony provided by Ms. Troyer. There is also an elevated risk of error since most of the charges were based mainly on the DNA evidence and Ms. Troyer's testimony. *Id.*

**{¶110}** Further, Appellant's request for a DNA expert met the particularized showing under *Mason.* In his motion requesting an expert, Appellant explained that the State would be relying on DNA evidence and the testimony of its own expert. Appellant's motion stated that an expert was necessary to determine if the State's DNA evidence was unreliable or contained incomplete data. (Mot. for Payment of Expert Witness Fees). At the hearing on the request for expert fees, counsel explained that the expert would also evaluate the DNA evidence to address the potential transferability of semen and other body fluids that could occur through nonsexual means. (Aug. 12, 2021 Tr. at 4).

**{¶111}** For these reasons, we find that Appellant's first assignment of error has merit in part. We hold that the trial court abused its discretion by denying Appellant's request for a DNA expert as to all rape and sexual battery charges.

**{¶112}** We emphasize that we render no opinion on the evidence or guilt or innocence. As the Ohio Supreme Court stated in *State v. Bunch*, Slip Opinion No. 2022-Ohio-4723, ¶ 51, "[o]ur focus in this decision is not on the merits* * *; instead, it is on the adequacy of the process leading up to a decision."

**{¶113}** In his second assignment of error, Appellant asserts:

**THERE WAS INSUFFICIENT EVIDENCE TO CONVICT THE DEFENDANT OF COUNTS 72 AND 73 (GROSS SEXUAL IMPOSITION OF CHILD VICTIM Z.R.)**

**{¶114}** Appellant quotes Z.R.'s trial testimony and contends that the elements of GSI under R.C. 2907.05(A) were not met because the material element of force or threat of force was not established. He cites Z.R.'s testimony that she did not remember him touching her and he never had her touch him. (Tr. at 479-481, 498). He also asserts that even if he touched her breast, no evidence established that he used force or threatened force.

**{¶115}** Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). Sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id*. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements proven beyond a reasonable doubt. *Smith*, 80 Ohio St.3d at 113. When evaluating the sufficiency of the evidence to prove the elements, it must be remembered that circumstantial evidence has the same probative value as direct evidence. *State v. Thorn*, 7th Dist. Belmont No. 16 BE 0054, 2018-Ohio-1028, ¶ 34, citing *State v. Jenks*, 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991) (superseded by state constitutional amendment on other grounds).

**{¶116}** Counts 72 and 73 of the indictment provided that Appellant:

> On or about 11/1/2018 through 6/17/2019, * * * did have sexual contact with Z.R. (DOB 04/11/2005), not his spouse, when Dustin L. Ruiter purposely compelled such person(s) to submit by force or threat of force, in violation of Section 2907.05(A)(1), 2907.05(C)(1) of the Ohio Revised Code * * *.

(Indictment).

**{¶117}** R.C. 2907.05(A)(1) provides the following:

> No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
>
> The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force.

**{¶118}** "Sexual contact" under R.C. 2907.01(B) is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

**{¶119}** Viewing the testimony of Z.R., CNP Malmer, and A.R. in the light most favorable to the prosecution, any rational trier of fact could have found that Appellant committed at least two instances of sexual contact with Z.R. *Smith*, 80 Ohio St.3d at 113. Z.R's testimony on both direct and cross-examination sufficiently established that Appellant touched her breasts under the guise of measuring her for a bra. (Tr. at 479-480, 499). Z.R. also testified that Appellant checked the hygiene of her and A.R. by having them lay on the edge of bed or the couch, take off their bottoms, spread their legs, spread their vaginas with their fingers, and allow him to look there for "cleanliness." (Tr. at 498). When asked if Appellant touched parts of her body, Z.R. testified that Appellant "would like smack our butts." (Tr. at 480).

**{¶120}** Further, while Z.R. testified that she could not remember her disclosures to Children's Services or investigators, CNP Malmer testified that she watched the caseworker interview Z.R. and took notes during that interview. (Tr. at 889). She testified that Z.R. told the caseworker that when Appellant required her to show her vagina to him to check for periods and hygiene, he would touch her vagina when he could not see sufficiently. (Tr. at 893). CNP Malmer opined that this was grooming behavior and she diagnosed Z.R. with sexual abuse. (Tr. at 892).

**{¶121}** Moreover, when A.R. testified that Appellant touched her vaginal area when he performed these hygiene checks, she was asked if Appellant did this to Z.R. as well. (Tr. at 159). A.R. testified, "I believe so." (Tr. at 519).

**{¶122}** Accordingly, sufficient evidence was presented of at least two instances of sexual contact by way of testimony that Appellant touched Z.R.'s breasts, her buttocks, her vaginal area and/or her pubic area. "[I]n a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime." *State v. Flood*, 10th Dist. Franklin No. 18AP-206, 2019-Ohio-2524, ¶ 16, quoting *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4.

**{¶123}** Appellant also challenges the sufficiency of the evidence establishing the "force or threat of force" element of R.C. 2907.05(A)(1). He contends that no probative evidence of force was proffered at trial.

**{¶124}** This assertion lacks merit. R.C. 2907.05 (A)(1) requires that the victim's submission to sexual contact or conduct be obtained by force or threat of force. The force element needed to prove the offense of gross sexual imposition is the same as it is for rape. *State v. Riggs*, 10th Dist. Franklin Nos. 04AP-1279, 04AP1280, 2005-Ohio-5244 ¶120. "'Force means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A).

**{¶125}** In *State v. Eskridge*, 38 Ohio St.3d 56, 58-59, 526 N.E.2d 304 (1988), the Supreme Court of Ohio concluded that "[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Id.* at 58-59.

**{¶126}** The Ohio Supreme Court has held that "[t]he youth and vulnerability of children, coupled with the power inherent in a parent's position of authority creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose." *Id*. at 59. The Court further held:

> The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each

> other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength."

*Id.* at paragraph one of the syllabus.

**{¶127}** In *State v. Schaim*, 65 Ohio St.3d 51, 1992-Ohio-0031, the Court limited the *Eskridge* "psychological force" component. The Court held that the parent-child psychological force did not apply to the abuse of an adult victim whose father had sexually abused her from when she was a preteen until she was twenty years old. In distinguishing the victims in both cases, the Court held that:

> The same rationale does not apply to an adult. No matter how reprehensible the defendant's alleged conduct, a woman over the age of majority is not compelled to submit to her father in the same manner as is a four-year-old girl. She is no longer completely dependent on her parents, and is more nearly their equal in size, strength, and mental resources. Although we are aware of the devastating effects of incest on its victims, and are sympathetic to the victim whose will to resist has been overcome by a prolonged pattern of abuse, we reluctantly conclude that a pattern of incest is not always a substitute for the element of force required by R.C. 2907.02(A)(2).

*Id.* at 55.

**{¶128}** In *State v. Haschenburger*, 7th Dist. Mahoning No. 05 MA 192, 2007-Ohio-1562, we held that the *Eskridge* psychological force component could apply when the child-victim is over the age of 13. We conducted a plain error analysis of the jury instruction, which included the *Eskridge* psychological force definition to a charge of rape against an adult friend of the victim's father after he sexually abused the victim when she was 14 years old. *Id*. We agreed with other Courts in the District that the proper definition of force "where the victim is not of so tender an age as *Eskridge* is whether the victim's will was overcome by fear or duress." *Id*. at ¶ 44, citing *State v. Dippel*, 10th Dist. No. 03AP-448, 2004-Ohio-4649 (victim was 14 years old); *State v. Oddi*, 5th Dist. No.

02CAA01005, 2002-Ohio-5926 (victim was 15 years old); *State v. Nieland*, 2d Dist. No.2005-CA-15, 2006-Ohio-784 (victim was 15 and 16). We found no plain error in the jury instruction. *Id*.

**{¶129}** In the instant case, Z.R. was 16 years old when she testified and she stated that Appellant, her father, began checking her vagina for cleanliness when she was in eighth grade. (Tr. at 498). She testified that Appellant would threaten her and her siblings and she would get scared when he threatened her. (Tr. at 474). She stated that he frequently yelled and was frequently angry. (Tr. at 474). While she testified that Appellant did not get physically violent with her, she saw him hurt W.R. and saw him punch both K.F. and A.R. in their faces. (Tr. at 494).

**{¶130}** Based on the parent-child relationship, Z.R.'s age, and her testimony that she was afraid when Appellant threatened her, and she witnessed him hit her sisters, we find that the State presented sufficient evidence to prove that Appellant used or threatened force to make Z.R. submit to his sexual contacts.

**{¶131}** Accordingly, Appellant's second assignment of error lacks merit and is overruled.

**{¶132}** For the reasons stated above, we reverse the trial court judgment as to all rape, attempted rape, and sexual battery convictions against Appellant and we remand this case to the trial court to appoint a DNA expert for Appellant. The trial court's judgment as to Appellant's gross sexual imposition convictions and sentence as to Z.R. is affirmed.

Waite, J., Dissents with Dissenting Opinion.

Robb, J., Concurs.

Waite, J., dissenting.

**{¶133}** Appellant Dustin Ruiter is challenging his jury convictions for rape, attempted rape, sexual battery, and gross sexual imposition. The victims of the crimes were two of Appellant's daughters, Z.R. and A.R., and also his stepdaughter K.F. The majority has concluded that some of the convictions should be reversed because the trial judge failed to grant Appellant's motion for a DNA expert at state expense. I disagree with this conclusion in the majority opinion, and I would affirm the convictions and sentence in full.

**{¶134}** There is no question that, as a matter of due process, indigent defendants are entitled to the basic tools of an adequate defense, which may mean that the state is to provide funds for a necessary expert witness. *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). The standard of review of a trial court decision to deny the expenditure of state funds for an expert witness is, as the majority correctly notes, an abuse of discretion. *State v. Mason*, 82 Ohio St.3d 144, 694 N.E.2d 932 (1998). "Due process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution, requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." *Id*. at syllabus. "[I]t is appropriate to consider three factors in determining whether the provision of an expert witness is required: (1) the effect on the defendant's private interest in the accuracy of the trial if the requested service is not provided, (2) the burden on the government's interest if the service is provided, and (3) the probable value of the additional service and the risk of error in the proceeding if the assistance is not provided." *Id*. at 149. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Sahady*, 8th Dist. Cuyahoga No. 83247, 2004-Ohio-3481, ¶ 23.

**{¶135}** Appellant's counsel explained at the August 12, 2021 hearing that he sought to hire an expert to evaluate the biological evidence obtained from K.F. in order to explore the idea that semen and bodily fluids may have been transferred by non-sexual

means. (8/12/21 Tr., p. 4.) Although Appellant had approximately two years to come to some more certain conclusion about whether such a possibility could be proven, or whether there was an expert willing to try to prove it, the record shows that this was presented to the trial judge as nothing more than a vague theory on the part of the defense. At that hearing, it became clear the issue was not the cost of the expert, which was initially supposed to be paid for by a family friend, but that the request for an expert was being made too late in the trial process, long after the cutoff date for discovery and providing expert reports. (8/12/21 Tr., p. 4.)

**{¶136}** Based on Appellant's own argument at the August 12, 2021 hearing, the expert he sought would not conduct separate tests and would not challenge the fact that Appellant's DNA was found on vaginal and anal swabs taken from K.F. At best, such an expert might argue that Appellant's DNA was possibly present due to reasons other than through sexual contact.

**{¶137}** As the trial judge pointed out during the August 12, 2021 hearing, Appellant's counsel could challenge the DNA and other biological evidence during cross-examination of Brittani Troyer (the state's BCI witness) to establish the theories that the requested expert might discuss. The trial transcript also reveals that Appellant's counsel did, in fact, effectively challenge the significance of the DNA evidence, the inconclusiveness of the presence of acid phosphatase, the absence of evidence indicating the presence of sperm or semen, and the possibility that the DNA was transferred through a process called "shedding" DNA from one object to another, or one person to another.

**{¶138}** At no time did Appellant make a particularized showing of the need for an expert or that it would be unfair to try him absent an expert. First, the mere possibility an expert might be able to come to a particular conclusion about DNA evidence does not constitute a particularized showing. *State v. Cable*, 2nd Dist. Miami No. 2017-CA-23, 2018-Ohio-3923, ¶ 14. Appellant’s desire to prove that his DNA was somehow planted or accidently appeared on the swabs in the rape kit was his mere speculation that it could be proven. A trial judge is not required to approve funds for an expert witness based on mere speculation. *State v. Schroeder*, 4th Dist. No. 18CA1077, 2019-Ohio-4136, 147 N.E.3d 1, ¶ 126.

**{¶139}** Second, Appellant's counsel did not even argue that an expert was necessary until less than two months before trial. Thus, counsel's own actions indicate that an expert was not necessary.

**{¶140}** Third, DNA evidence has been used in criminal cases for many decades and is no longer considered to be novel or unusual. *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 80. Defense attorneys are expected to educate themselves regarding DNA evidence to sufficiently conduct cross-examination of the state's witnesses. *State v. Alltop*, 12th Dist. Fayette No. CA2013-06-018, 2014-Ohio-1695, ¶ 16. This record reflects that Appellant's alleged purpose for hiring an expert could be achieved (and indeed was achieved) through cross-examination.

**{¶141}** Fourth, there is no showing of particularized need when the content of the expert testimony would be merely cumulative to other testimony or evidence. *Cable* at ¶ 14; *State v. Williams*, 11th Dist. Lake No. 2005-L-213, 2007-Ohio-212, ¶ 44. The DNA expert that Appellant hoped to find could only supplement the cross-examination testimony of Brittani Troyer, and thus, does not constitute a necessity.

**{¶142}** Fifth, and possibly most important, there is no indication that Appellant's trial was not fair in the absence of an expert DNA witness. The state presented a formidable case involving the testimony of three victims, the thrift store owner who originally heard about the abuse, the officers who investigated the crimes, the nurse who treated K.F. and A.R., another nurse who diagnosed K.F. as a sexual abuse victim, Mahoning County Childrens Services caseworkers, and the forensic scientist from BCI who examined the biological evidence. Of course, there was also the existence of Appellant's DNA on the rape kit swabs. The fact that the state had a strong case did not make the proceedings unfair. Appellant was able to effectively cross-examine the witnesses, as well as present a character witness and his own testimony to support his side of the story. The lack of an additional witness to speculate as to how Appellant's DNA was found inside K.F.'s vagina was not going to materially alter the strength of the state's case.

**{¶143}** As far as the trial court's comment to the effect that hiring an expert was not a right but a privilege for those who could afford it, the court was paraphrasing what has been established law for decades: "[D]ue process does not require the provision of

expert assistance relevant to an issue that is not likely to be significant at trial. Nor does due process require that an indigent defendant be provided all the assistance that a wealthier counterpart might buy. Rather, he or she is entitled only to the basic and integral tools necessary to ensure a fair trial." *Mason* at 149. Once again, the focus is on whether the trial was fair, not whether Appellant's expert was or was not provided.

**{¶144}** It is clear from this record, especially from the many citations to the record in the majority opinion, that Appellant did not establish a particularized need for an expert, had alternate means of challenging state's BCI witness by careful use of cross-examination, and that the trial was fair because Appellant's counsel did in fact very effectively cross-examine the state's witness regarding the DNA and other biological evidence. These circumstances all support the appropriate use of the trial court's discretion in overruling the motion for funds to hire an expert DNA witness. The thrust of Appellant's defense was that the girls were lying and that they obtained and used knowledge allowing them to "plant" DNA evidence. Even if Appellant actually found an expert to support his theory, that expert could only attack the state's witnesses. As noted here and in the majority opinion, Appellant's counsel did an excellent job in such an attack. For all these reasons, I dissent from the majority's conclusion sustaining Appellant's first assignment of error. I would overrule both assignments of error and affirm the judgment of the trial court in full.

---

For the reasons stated in the Opinion rendered herein, the first assignment of error is sustained in part, affirmed in part, and the second assignment of error is overruled. It is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is reversed as to all rape, attempted rape, and sexual battery convictions, and remanded to the trial court to appoint a DNA expert for Appellant and to conduct further proceedings according to law and consistent with this Court's Opinion. The trial court's judgment as to the gross sexual imposition convictions and sentence is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

**NOTICE TO COUNSEL**

**This document constitutes a final judgment entry.**